Tucker, Judge.
This is an appeal from a judgment of the district court of Suffolk, whereby it was ordered, that a paper writing purporting to be a codicil to the last will and testament of Cornelius Calvert, deceased, should be sent back to the court of the borough of Norfolk, to be there proved, and admitted to record.
The codicil was executed, in the usual form, before two witnesses, in the presence of the decedent, who testified to his sanity: And the circumstances attending the execution, were as follows:
John Calvert, having been security for his brother Cornelius on an administration bond, as he supposed, (although it proves to be a guardian’s bond), and hearing that his brother had made a will, and left his land and all his estate to James Tucker, the appellant; on Saturday evening before *94 the death of the brother, went to see him, and told him that he had been informed he had .altered his will, and left all his estate to the appellant; and that he wished him to alter his will and leave his lands subject to any claims of the Walke estate. Cornelius Calvert replied, it shall be so; and come here to-morrow; Mr. Tucker will be here, and I will then alter the will. After some further conversation, John Calvert took, from his pocket, a written paper, and stated to his brother, that he wished him to execute that paper, as a codicil. Cornelius desired him to read it; which he did; and, when he had done so, Cornelius said it was very proper, and should be executed. The witness (Mrs. Ingram) recollects that the paper read to Cornelius Calvert provided that the land should be liable to pay the debt due to the Walke estate ; and she is positive that the writing referred to the will, and spoke of a revocation thereof, or of part thereof. In confirmation of this circumstance, she says that, when she went home, she mentioned it to her sister Martin; who confirms what she says. On being cross interrogated, she says she thinks, but is not positive, that the paper produced by John Calvert was written only upon one side. That Cornelius Calvert did not read the paper himself. That she attended to the substance, and not to the manner in which it was written, and does not recollect that it was turned over in reading it.
David Moore deposes, that, on Sunday, the succeeding day, he and Andrew Wood accompanied John Calvert, at his request, to his brother’s house to witness an instrument of writing. That John Calvert stated to his brother, that he had come to have the writing executed; that the latter expressed his willingness to do so; and, at his request, John Calvert read the paper: that, when he had finished, Cornelius Calvert said, that he had an objection to the clause which provided that all his lands should be subject to sale to pay off any debt due the Walke estate, and wished it to be altered by inserting the words “ as much of,” in order that only such part as was necessary should be sold; that *95 see any other alteration made, except the interlineation of the words “ as much of:” that he cannot say he kept his eye upon the paper while John Calvert was writing; that he does not suppose he took more than a minute in writing, if that; that he attended to the contents of the paper as John Calvert read it, but does not recollect the particulars further, than above stated; that he is not quite positive, whether John Calvert read the whole; that he thinks he read part; but cannot swear he read the whole; that Cornelius Calvert did not read the paper himself; but it was read to him, at his request, by John Calvert; that the witness did not know that it was a codicil to a will, but thought it was only an instrument of indemnification. an alteration was immediately made by John Calvert by striking out the word “ all,” and inserting “ as much of;” that the instrument was then, either partially, or wholly, read again; that Cornelius Calvert appeared satisfied with it, and signed it in the presence of both witnesses. The witness then asked him, if he acknowledged the writing for the within purposes: He replied, certainly; and both witnesses, at his request, and in his presence, signed their names to it. On being cross interrogated, he says he saw the paper when first read by John Calvert; that he thinks it must have been written on both sides, because he did not
The testimony of Andrew Wood was nearly to the same effect. He thought the whole was read over, but is not positive : Remembers that John Calvert turned the paper over when he read; and that he, the witness, wrote his name on the back part of it.
The paper produced as a codicil, is a quarter sheet, written wholly on one side, and three or four lines on the back. The ink, with which the first side is written, is visibly paler than the words “ as much of,” afterwards interlined, or than the clause of revocation, attestation and signatures. The clause of revocation begins about half way in the last line, as follows: “ Revoking hereby the clause in my will, whereby I have bequeathed and given away my lands.” In wit» ness, &e.
*96 It is objected to this paper as a codicil, that it was obtained by fraud and imposition on the part of John Calvert; that it was never fairly read over to the deceased; that the clause of revocation was surreptitiously added while he was pretending to alter the word “ all,” and insert “ as much of,” agreeably to the desire of the deceased ; that the different colour of the ink shews this; and that the whole was a mere juggle.
The question to be decided is merely a question of fact, Whether the whole of this paper was fairly read over to the deceased before he approved of, and signed it ? The different colour of the ink is obvious, and it is a circumstance which creates very great doubt in my mind. It is not, however, a conclusive evidence of fraud, although it certainly furnishes grounds of presumption. It is a circumstance which may be explained perhaps in a manner perfectly satisfactory, although the evidence now before the court does not explain it. But, notwithstanding, the evidence before us does not explain the manner in which this happened, nor in any manner account for it to my satisfaction, I incline to believe the presumption of fraud, arising out of this circumstance alone, is not quite strong enough to overturn the paper as a codicil. Mrs. Ingram is positive that she heard John Calvert read a paper the preceding evening, which contained a clause of revocation, and her testimony, as to this fact, is strongly corroborated by that of her sister Martin. The testator on the next day, as well as the preceding evening, was in his perfect senses: the acuteness of his intellects is manifested by the alteration he directed. Probably both he and John Calvert thought a clause of revocation necessary, neither of them being learned in the law. Moore states, that the paper was read at the testator’s request, and when finished, he made the objection to the word “ all,” and directed the amendment; that it was either wholly or partly read to him after the alteration. And Wood thought the whole was read over, and remembers that John Calvert turned it over when he did read it. If it were not for the *97 difference in the colour of the ink, I should not have the smallest doubt in my mind. For the witnesses are all positive and particular, as men of plain understandings, not professionally informed of the minute circumstances to be attended to on such occasions, nor in the habit of being often present at them, may be expected to be. Cornelius Calvert was, by no means, in such a state of mind, I conceive, as to suggest the idea that a fraud of this kind could be successfully practised upon him. He was naturally of a suspicious temper •, and, although it appears he did not read the paper, it is by no means presumable that he could not. If the whole clause of revocation and attestation was written in his presence, it would probably have taken more time than the witnesses suppose was employed by John Calvert in making the alteration his brother directed. If the fraud was premeditated by John Calvert, I can see no reason why he should have delayed preparing the paper for that purpose until he got into his brother’s presence. Nor why he should have ventured to have written in the presence of the witnesses, that which, if he did not read to the testator, must vitiate the paper he wished to impose upon him as a codicil. On these grounds, although I cannot explain this suspicious circumstance of the difference in the colour of the ink, 1 think the weight of testimony overbalances the presumption of fraud arising out of that circumstance alone. Calvert, being a party to this contest, could not be examined. It is possible that if a suit in chancery should be instituted, for the purpose of setting aside this paper as a codicil, he might, by his answer, or as a witness, disclose circumstances which could not be brought before the court in this contest. Had the appellants submitted to the judgment of the district court, and proceeded in that manner to set aside this paper, there might have been less room for doubt than there is at present, either by removing all suspicion of fraud, or by fixing it indelibly upon the appellee. Balancing thus, I must nevertheless incline, as I always in such a case shall, to affirm the judgment of the district court.
*98 Roane, Judge,
observed, That the sanity of the testator was completely established; and that, upon the whole, he thought it was proved that all the codicil was read to him. That it was as well proved as usual; and, as the forms of the statute had been complied with, those who opposed the probat should have proved the fraud. That, not only might the testator have had various motives for altering his will, but it was, at least, as probable that he directed the amendments and clause of revocation, as that John Calvert committed a fraud, without any interest in doing so : and therefore that he was for affirming the judgment of the district court.
Fleming, Judge.
The whole object of the codicil was to indemnify John Calvert; who prepared, and presented it to the testator, then upwards of eighty years old, sick and weak. Of course it ought to be free from any taint of suspicion ; but the circumstances are the other way. For it recites that John was bound for him ; and it turns out in fact that that was not the case : which shews the great imbecility of his mind at the time. A will, solemnly made, ought not to be lightly annulled : and the testimony here is not satisfactory that the testator knew of the general clause of revocation. It is not sufficiently proved that it was read to him; which certainly ought to have been very clearly proved, as it is manifest that the most which even John Calvert pretends, is that he meant to secure him; and as the clause goes so far beyond that, the proof of the knowledge ought to be beyond all exception. Instead of this, I think the testimony is that he did not know the nature of it; and, therefore, I am of opinion that the codicil is void, and ought not to have been recorded. Consequently, I think the judgment of the district court ought to be reversed, and that of the hustings court affirmed.
Carrington, Judge.
Every testator, before he executes his will, ought to be perfectly acquainted with its contents, *99 either by having written it, or by reading it over himself, or by its being faithfully read to him by another. By which, I do not mean to say, that, in every case, it is necessary, that the witnesses should prove one of these three things to have been done; for, in general, it is enough that the witnesses are able to prove that the testator was in his senses, at the time of executing it, because it m\\ prima facie be presumed, that a man in his senses made himself acquainted with its contents before he published it as his last will. But, if there be any reasonable grounds to doubt the testator’s knowledge of its contents, those who would prove the will should be able to shew that its provisions were known to him at the time of its execution. In the present case, the proof of the testator’s knowledge, or assent, is very defective, although there are several grounds to conclude that he was not acquainted with the whole contents of this codicil. The subscribing witnesses prove that John Calvert called on thorn to attend him to the house of the testator to attest a paper, drawn up by himself, and to be executed by the testator as a codicil to his will. That he expressed himself to be deeply interested in having it done. That they found the testator in extremis, and so far gone, that, although in his senses, he was not able to read, but was supported when he signed it, and that he died the next day. These circumstances are suspicious. That a paper should be prepared by an interested person in the absence of the testator, and brought to him to be executed at a time when he was under certainly great bodily, if not mental debility, is so singular that it calls for an explanation, which I think it has not received. It was attempted to be shewn that the paper was read to him by John Calvert; but whether all, or only a part of it, was read, the witnesses are unable to say, having never read it themselves. Mrs. Ingram, a non-subscribing witness, remembers that on the day before, she heard John Calvert read a paper to the testator, which had a revoking clause in it, but the subscribing witnesses remember no such thing. The proof of the testator’s knowledge, therefore, is very in *100 adequate; and, upon the whole, I am for reversing the judgment of the district court, and affirming that of the hustings court.
Lyons, President.
None of the parties concerned were, perhaps, guilty of fraud; but the rules of law must be observed, and care taken not to open a door to surprize upon testators. The testator should either write, or read the will himself, or it should be read to him by some other person, or there can be no assent of his mind to the contents, and the opportunities for deception will be very frequent: Nothing would be so easy as to obtrude a will upon a man worn down with the weight Of years, or languishing upon his death bed. In the present case, it is not proved either that the testator wrote the codicil; that he read it himself; or that it was read to him. Indeed, the proof is the other way: For John Calvert, the party interested, prepared it; and although he affected to read it,, yet there is no proof that he read the whole of it, and there was no opportunity afforded the friends of the deceased of consulting the testator, and knowing whether it fairly expressed his intentions or not; for John Calvert carried it off immediately, and refused to let any body see it. Under these circumstances, it is impossible to say, that there was that free and full assent of the mind to every part of this paper which the law calls for; and which the infirmities of human nature, and the snares to which old age, or sickness, may be exposed, rend.er it proper that the court should require to be proved. The hustings court were well acquainted with the parties and the witnesses, and the question was examined by them soon after the transaction. They rejected it, and I see no reason to differ from them in opinion. I therefore concur that the paper is not to be proved as a codicil to the testator’s will, but that it is to be rejected altogether. Of course, the judgment of the district court is to be reversed, and that of the hustings court affirmed.